# EXHIBIT 1

<u>**SETTLEMENT AGREEMENT AND**</u>
<u>**RELEASE OF ALL CLAIMS**</u>

WHEREAS, plaintiff MAKYYLA MARIE HOLLAND, hereinafter, "PLAINTIFF", initiated the above-captioned lawsuit, hereinafter, the "ACTION", on or around March 29, 2022;

WHEREAS, PLAINTIFF filed the operative amended complaint on or around September 13, 2022, alleging constitutional and state law violations by BROOME COUNTY, DAVID E. HARDER, MARK SMOLINSKY, PARRIS GEORGE, ADAM VALLS, DAVID ALLEN, FRANKLIN BIRT, MICHAEL McCAFFERTY, MATTHEW SIMECK, DANIEL WEIR, JOSEPH DAVIS, NICHOLAS BIXBY, DOUGLAS DAILEY, ADAM WILCOX, BRIAN DOYLE, and COLIN RILEY, hereinafter, the "COUNTY DEFENDANTS" and ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D., in connection with incidents involving PLAINTIFF alleged to have occurred between January 22, 2021 and July 2, 2021 in or around the Broome County Jail in Binghamton, Broome County, New York, hereinafter "INCIDENT", and DEFENDANTS filed their respective Answers on or about September 26, 2022 & September 28, 2022 denying any alleged constitutional and state law violations;

WHEREAS, the parties to the ACTION are desirous of resolving their dispute amicably;

WHEREAS, PLAINTIFF, by and through her attorneys, requested information from Broome County Department of Social Services on the existence and amount of any lien or claim for Medicaid or Public Assistance related to the INCIDENT;

WHEREAS, Broome County Department of Social Services confirmed that it has no record of any Medicaid or Public Assistance to PLAINTIFF in connection with the INCIDENT;

WHEREAS, PLAINTIFF and PLAINTIFF's attorneys are not aware of any liens or claims applicable to the proceeds of the settlement;

**NOW THEREFORE,** it is STIPULATED AND AGREED by and among the parties to this agreement, through their respective attorneys, subject to the conditions set forth herein and consideration of the covenants and promises contained herein, as follows:

FOR AND IN CONSIDERATION of the sum of ONE HUNDRED SIXTY THOUSAND DOLLARS AND NO CENTS ($160,000.00), hereinafter, the "SETTLEMENT AMOUNT," and the policy-related relief described below, the sufficiency of which is hereby acknowledged, the undersigned, PLAINTIFF, her heirs, agents, estates, servants, successors, administrators and assigns, hereinafter "RELEASOR", hereby releases, remises, acquits, satisfies, and forever discharges the COUNTY DEFENDANTS as well as each of their estates, heirs, executors, successors in interest, assigns, predecessors, parent companies, suborders, subsidiaries, entities, business units, affiliates, owners, directors, members, managers, officers, partners, representatives, shareholders, attorneys, independent contractors, subcontractors, employees, insurers, underwriters, agents, subrogates, assigns, companies, leasers, lessees, franchisees, and servants, hereinafter, the "COUNTY RELEASED PARTIES", and CBH MEDICAL, P.C. AND SM DENTAL, P.C., EMPRO INSURANCE COMPANY, hereinafter, "CBH-SM-EMPRO", and ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D. as set forth in the General Release executed by PLAINTIFF and past, present, and future officers, directors, members, shareholders, attorneys, trustees, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors, and successors in interest and assigns and all other person, firms, or corporations with whom any of the former have been, are now, or may hereafter be affiliated, hereinafter, collectively with CBH-SM-EMPRO, the "CBH SM EMPRO RELEASED PARTIES", and collectively with the COUNTY RELEASED PARTIES, the "RELEASED PARTIES", who are or might be liable directly or vicariously in any way from any and all claims, actions, causes of action,

6

demands, rights, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, liens, med

pay, personal injury protection, specialties, covenants, contracts, controversies, agreements,

promises, variances, trespasses, damages, judgments, executions, expenses, compensation, rights,

attorney fees, costs, loss of services, expenses, compensation and damages whatsoever, whether

common law, statutory or extra contractual, which the RELEASOR now has or which may

hereafter accrue in law or in equity in any way growing out of or resulting from the "INCIDENT".

This SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS, and all terms herein, is

collectively referred to hereinafter as the "AGREEMENT".   RELEASOR and RELEASED

PARTIES are collectively referred to hereinafter as the "PARTIES".

Payment of the SETTLEMENT AMOUNT shall be made as follows:  Within thirty (30)

days, the COUNTY RELEASED PARTIES shall pay or cause to be paid ONE HUNDRED

FORTY THOUSAND DOLLARS AND NO CENTS ($140,000.00) and the CBH-SM-EMPRO

shall pay or cause to be paid TWENTY THOUSAND DOLLARS AND NO CENTS ($20,000.00)

to PLAINTIFF by depositing such sums in an escrow account maintained by the New York Civil

Liberties Union Foundation.

For and in further consideration, and in addition to the SETTLEMENT AMOUNT,

BROOME COUNTY has adopted and implemented the policy entitled LGBTI (Lesbian, Gay,

Bisexual, Transgender, Intersex) Guidelines for Safe Confinement, hereinafter, the POLICY,

attached to this AGREEMENT as Exhibit A, effective beginning August 1, 2023.

In consideration for the SETTLEMENT AMOUNT and POLICY, the RELEASOR

represents and covenants that the RELEASOR will dismiss with prejudice any pending actions

against any of the RELEASED PARTIES arising in whole or in part out of the INCIDENT and

will refrain from filing any other actions, lawsuits, proceedings, claims, charges, or complaints

against any of the RELEASED PARTIES arising in whole or in part out of the INCIDENT with any local, state, or federal agency, self-regulatory organization, administrative, arbitration forum, court, or other entity.

The RELEASOR represents and covenants that the RELEASOR makes no claim against any other person in this ACTION for vicarious liability for any alleged acts or omissions of CBH MEDICAL, P.C. and SM DENTAL, P.C., including but not limited to its medical and mental health staff, members, employees and/or agents, ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D. arising from the INCIDENT and will not prosecute or assert any claim or action against any other person or entity for liability for any acts or omissions of CBH MEDICAL, P.C. and SM DENTAL, P.C., including but not limited to its medical and mental health staff, members, employees and/or agents, ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D. arising from the INCIDENT;

The RELEASOR and RELEASED PARTIES have agreed to settle in order to avoid the inconvenience, distractions, and inherent uncertainties associated with any legal proceeding, and the additional legal fees and expenses of continuing this dispute. This AGREEMENT represents a compromise of a disputed claim and any liability, wrongdoing, malfeasance, misfeasance, or negligence on the part of the RELEASED PARTIES is expressly denied.

The RELEASOR agrees and acknowledges that no promise, inducement, or agreement, not expressly contained in this AGREEMENT, has been made to her. This AGREEMENT supersedes all previous agreements or understandings, whether written or oral, and contains the entire agreement by and among the RELEASOR and RELEASED PARTIES with respect to the INCIDENT. This AGREEMENT may not be altered, modified, or amended except in a writing signed by the RELEASOR and RELEASED PARTIES. The RELEASOR represents and warrants

8

that she has the authority to enter into this AGREEMENT, and she intends to be legally bound by it.

The RELEASOR represents and warrants that no other person or entity has any interest in the claims, demands, obligations, or causes of action referred to in this AGREEMENT; that she has the sole right and exclusive authority to execute this AGREEMENT and to receive the sums specified in it; and that there has not been, nor will there be, an assignment or other transfer of any claim, interest right which the RELEASOR may have arising in whole or in part out of the INCIDENT or in any way connected to the INCIDENT.

The RELEASOR and RELEASED PARTIES agree and acknowledge that the sums received pursuant to this AGREEMENT are in satisfaction of the RELEASOR's claims for compensatory damages for alleged physical injuries and emotional distress arising from physical injuries.  In entering into this AGREEMENT, it is understood and agreed that the RELEASOR relied wholly upon the RELEASOR'S own judgment, belief, and knowledge of the nature, extent, and duration of any injuries and damages.  No representations or statements made by the RELEASED PARTIES or by any person or persons representing the RELEASED PARTIES or by any physician employed or engaged by the RELEASED PARTIES regarding any injuries and damages or regarding any other matters arising in whole or in part out of the INCIDENT, or in any way connected to the INCIDENT has influenced the RELEASOR to any extent whatsoever in entering into this AGREEMENT.

The RELEASOR hereby declares that she has had the benefit of advice from her attorneys, and the terms of this AGREEMENT have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise of any and all claims arising in whole or in part from the INCIDENT.

The RELEASOR hereby acknowledges and agrees that RELEASOR expressly waives and assumes the risk of any and all claims for damages against the RELEASED PARTIES that were or could have been asserted in this ACTION but of which the RELEASOR does not know or suspects to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect RELEASOR'S decision to enter into this AGREEMENT. The RELEASOR understands that this claim is being settled as a business decision only and that payment of the sum and POLICY specified herein are being made as a complete compromise of matters involving disputed issues of law and fact and the RELEASOR thereby assumes the risk that the facts or law may be otherwise than RELEASOR believes.

The RELEASOR hereby acknowledges and agrees, that any and all liens against RELEASOR, including, but not limited to liens resulting from the payment of medical expenses, and/or any unpaid medical expenses and/or liens resulting from payment of Worker's Compensation benefits, Medicaid, Medicare, Social Security, and/or Social Services Department benefits are exclusive and sole responsibility of RELEASOR. PLAINTIFF will have the sole responsibility to satisfy any lien or claim asserted against the settlement proceeds or arising from the settlement. PLAINTIFF and PLAINTIFF's attorneys are not aware of any liens or claims applicable to the proceeds of the settlement, and Broome County Department of Social Services confirmed that it has no record of any Medicaid or Public Assistance to PLAINTIFF in connection with the INCIDENT. Further, PLAINTIFF agrees to pay any future Medicare liens that may arise that are determined to be have resulted from the INCIDENT.

The RELEASOR agrees to indemnify, defend, and hold harmless the RELEASED PARTIES, its agents, servants, employees, and attorneys from any and all liens, either known or unknown, asserted against the settlement proceeds. RELEASED PARTIES have confirmed no

Social Services Department benefits liens conferred on RELEASOR exist.

It is understood and expressly agreed to by the RELEASOR that any and all obligations, allocations, or other considerations relating to future medical expenses arising from the INCIDENT, including but not limited to Medicare obligations, are the sole and exclusive responsibility of RELEASOR.  RELEASOR agrees to indemnify, defend, and hold harmless the RELEASED PARTIES, its insurance carriers, agents, servants, employees, and attorneys from any and all claims, demands, judgments, arising from any future medical care or obligation arising under Medicare in connection with the INCIDENT.

RELEASOR agrees to indemnify, defend, and hold harmless RELEASED PARTIES including RELEASED PARTIES' and past, present, and future officers, directors, shareholders, attorneys, trustees, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors, and successors in interest and assigns and all other person, firms, or corporations with whom any of the former have been, are now, or may hereafter be affiliated, from any action, cause of action, claim, penalty, statutory fine, and attorneys' fees arising from the INCIDENT, that were or could have been asserted in this ACTION , including, but not limited to, an action to recover or recoup Medicare benefits paid or a loss of Medicare benefits or for any recovery sought by Medicare, including past, present, and future payments, benefits, and/or liens, and including any such claims, actions, causes of actions, enforcement proceedings, penalties, liabilities, and similar sanctions under the Medicare Secondary Payer Act.  RELEASOR further agrees to waive any and all potential future claims arising from the INCIDENT, that were or could have been asserted in this ACTION , against RELEASED PARTIES and insurers, including their past, present, and future officers, directors, shareholders, attorneys, trustees, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors, and successors in

11

interest, and assigns, and all other persons, firms, or corporations with whom any of the former have been, are now, or may hereafter be affiliated, under the Medicare Secondary Payer Act, 42 USC § 1395y (including any and all amendments thereto) and its accompanying federal regulations, 42 CFR §§ 411.1, et seq., including 42 CFR §§ 411.46 & 411.47.  It is the parties' intention and purpose under this paragraph to provide for the full protection and indemnification of RELEASED PARTIES and insurers, including their past, present, and future officers, directors, shareholders, attorneys, trustees, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors, and successors in interest, and assigns, from and against any claims, actions, causes of action, enforcement proceedings, penalties, fines, liabilities, and other sanctions that were or could have been asserted in the ACTION, or in any other forum, under the requirements, regulations, and provisions of the Medicare Secondary Payer Act and its accompanying regulations.

PLAINTIFF will hold harmless and indemnify EmPRO Insurance Company, its affiliates, and CBH MEDICAL, P.C. and SM DENTAL, P.C., including but not limited to its medical and mental health staff, members, employees and/or agents, ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D. on any claim or action for contribution, indemnification, or subrogation arising out of any act or omission of CBH MEDICAL, P.C. and SM DENTAL, P.C., including but not limited to its medical and mental health staff, members, employees and/or agents, ISHTIAQ HOSSAIN, M.D. and MAHMOOD AHMED, M.D. which were alleged or could have been alleged in this ACTION;

The RELEASOR and RELEASED PARTIES agree that this settlement does not constitute an admission of negligence on part of the RELEASED PARTIES.

12

To the extent that any term or provision of the AGREEMENT is deemed void or not in compliance with the applicable law, that term or provision alone will be void, while all other terms and provisions will be enforceable. The PARTIES shall have the opportunity to negotiate and modify any such provision to conform to such law.

RELEASOR and RELEASED PARTIES shall bear their own attorneys' fees and costs incurred in the litigation and through the execution of this AGREEMENT. Should it be necessary to enforce any term of this AGREEMENT, the prevailing party shall be entitled to reasonable attorneys' fees and costs expended to enforce this AGREEMENT. Notwithstanding the foregoing, should it be necessary or appropriate to challenge or enforce implementation of the POLICY, any application for an award of attorneys' fees and costs in connection with such challenge shall be made on a case by case basis.

The RELEASOR hereby acknowledges full and final settlement and satisfaction of any and all claims, demands, actions, and causes of action of whatever kind or character which RELEASOR has or may have against the RELEASED PARTIES by reason of the INCIDENT including, but not limited to, any claims for bad faith or excess judgment.

This AGREEMENT shall be construed and interpreted in accordance with the laws of the State of New York. This Court (the United States District Court for the Northern District of New York) will retain jurisdiction to enforce the terms of this AGREEMENT.

This AGREEMENT may be executed in counterparts, which, collectively, shall constitute one original. In addition, for the RELEASOR, facsimile signatures on the AGREEMENT with notarization are deemed acceptable and a photocopy may be used in place of originals for any purpose. For the RELEASED PARTIES, digital or facsimile signatures are deemed acceptable and the signature of counsel shall bind them.

**I HAVE READ THIS AGREEMENT AND UNDERSTAND AND AGREE TO THE
TERMS AND CONDITIONS CONTAINED IN IT.**

FOR THE RELEASOR:

By: _____
       MAKYYLA MARIE HOLLAND


STATE OF NEW YORK      )
                       ) ss
COUNTY OF NEW YORK     )


On the 23ʳᵈ day of August, 2023, before me personally appeared Makyyla Marie Holland, who
presented government-issued identification or who is known to me to be the person described in
and who executed the foregoing SETTLEMENT AGREEMENT AND RELEASE OF ALL
CLAIMS, and who acknowledged to me that she executed it as her own free act and deed.


_____
Notary Public

Trevor J. Hill
Notary Public, State of New York
No. 01HI6181594
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires 02/04/2024


FOR THE PLAINTIFF

DATED: August 23, 2023


BY: _____
       SHAYNA MEDLEY
Transgender Legal Defense &
 Education Fund. Inc.
520 8th Avenue, Suite 2204
New York, New York 10018
(646) 993-1675


BY: _____
       JEREMY A. BENJAMIN
Paul, Weiss, Rifkind, Wharton &
 Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3502

*Counsel for Makyyla Holland*


BY: _____
       ROBERT HODGSON
New York Civil Liberties
 Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300


14

FOR THE RELEASED PARTIES:

DATED: 8/23/23

BY: _____

    ROBERT G. BEHNKE
Broome County Attorney
Broome County Attorney's Office
Edwin L. Crawford County Office
Building
PO Box 1766
60 Hawley Street
Binghamton, New York 13902

*Counsel for the County Released Parties*

DATED: August 23, 2023

BY: _____

    JONATHAN E. SYMER
THE LAW OFFICES OF
STEINBERG, SYMER & PLATT, LLP
22 IBM Road, Suite 201
Poughkeepsie, New York 12601
(845) 471-4455

*Counsel for the CBH SM EMPRO Released Parties*

15

# EXHIBIT A

# LGBTI (Lesbian, Gay, Bisexual, Transgender, Intersex) Guidelines for Safe Confinement

## I.   <u>PURPOSE</u>

To provide guidelines for safe confinement of lesbian, gay, bisexual, transgender, gender nonbinary, gender nonconforming, and intersex (LGBTI) inmates and to comply with State and Federal legal/accrediting standards related to this population, including:

A. Elimination/reduction of discrimination and other stigmatization.
B. Appropriate classification and safe, secure housing; and
C. Ensuring personal safety and appropriate access to programs and care, while
D. Maintaining facility safety and the safety of all persons therein.

## II.   <u>POLICY</u>

It shall be the policy of the Broome County Sheriff's Correctional Facility (BCSCF) to receive, evaluate, house and provide secure, safe and humane custody of all persons, including transgender, gender nonbinary, gender nonconforming, and intersex inmates, who are committed to its custody. The BCSCF shall treat all people in its custody in a professional, respectful, and courteous manner that is consistent with all of their rights under state and federal law.  Any alleged violation of this policy as it relates to the treatment of any person housed in the BCSCF will be fully investigated and appropriate action taken to remedy a confirmed violation. A summary of this policy ( Addendum 2) will be inserted in the inmate handbook, uploaded to each inmate tablet, and the policy will be inserted in the service provider's manual.  A full copy of the policy will be available to people in custody upon request.

## III.   <u>DEFINITIONS</u>

<u>Bisexual</u>:  A person who is romantically or sexually attracted to more than one gender or sexual category.

<u>Gay:</u> Commonly refers to men typically attracted to other men.

**Gender identity:** Distinct from sexual orientation and refers to a person's internal, deeply felt sense of being male or female or something else.

**Intersex:** A person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female.

**Lesbian**: Commonly refers to women typically attracted to other women.

**LGBTI:** Acronym including lesbian, gay, bisexual, transgender, gender nonbinary, gender nonconforming, questioning, and intersex individuals.

**Gender nonbinary:** An adjective describing a person whose gender identity does not conform to the binary ("one or the other") categories of male or female. This person may self-identify as "nonbinary."

**Gender nonconforming**: An adjective describing a person whose gender expression is outside of sex-based societal assumptions about how they should look or behave. For example, a woman who dresses and cuts her hair in a manner that is stereotypically associated with men.

**Sexual orientation:** Romantic, physical, and/or emotional attraction to another person.

**Transgender** (or Trans): An adjective describing a person whose gender identity (i.e., internal sense of feeling male or female) is different from their assigned sex assigned at birth. For example, including a

> **Transgender woman**: A person whose sex-assigned-at-birth was male but is female may describe herself as a "transgender woman," "trans woman," or "woman."
>
> **Transgender man**: A person whose sex-assigned-at-birth was female but is male may describe himself as a "transgender man," "trans man," or "man."

## IV.   PROCEDURE

### A. EMPLOYEE CONDUCT

1. The Broome County Sheriff's Office maintains a zero-tolerance policy for any staff sexual misconduct (which includes sexual contact and/or sexual harassment) directed towards any inmate, including inmates that identify as LGBTI.

2. Any substantiated claim of sexual misconduct by a staff member towards an inmate may result in discipline up to and including termination of the staff member's employment and/or referral for criminal charges.

3. The Broome County Sheriff's Office maintains a zero-tolerance policy for the use of derogatory terms towards any members of the LGBTI community. Use of such terms directly violates Broome County Sheriff's Office code of conduct.

4. Staff shall not engage in any harassment or discrimination based on actual or perceived sex, sexual orientation, gender identity, or gender expression. A person's access to any rights, privileges, or opportunities available to other people in custody, including the right to seek protection or report instances of harassment or intimidation, shall not be denied or restricted due to that person's actual or perceived sex, sexual orientation, gender identity, or gender expression. A person who makes a complaint or seeks staff assistance about harassment, intimidation, threats, or violence shall not be denied such assistance or disbelieved due to that person's actual or perceived sex, sexual orientation, gender identity, or gender expression.

5. Within the reasonable bounds of safety for all inmates and staff, LGBTI inmates shall be able to express themselves through clothing or grooming choices.

6. Staff shall adhere to all confidentiality and privacy protections under applicable laws, including HIPAA. To the extent the person wishes to speak openly about such information, though, they may not be prohibited from doing so.

7. Staff shall report any complaint of harassment, discrimination, and/or abuse as received from an LGBTI inmate. Harassment, discrimination, and abuse due to a person's sex, sexual orientation, or gender identity or expression are not a normal or acceptable part of their incarceration and will not be tolerated. The facility will address and resolve any complaint of sexual assault, sexual harassment, or other threats to safety directed at any person in custody by any member of the staff or other person in custody.

## B. **COMMUNICATION**

All communication with LGBTI inmates shall be professional and without comments that could be deemed by a reasonable person to be harassing or demeaning.

1. Inmates are to be addressed by last name or by using the gender- specific identifier appropriate to the inmate's gender identity. For example, a transgender man who uses male pronouns will be addressed using expressions such as "mister" and "he/him," and a transgender woman who uses female pronouns will be addressed using expressions such as "miss" and "she/her."

2. If a transgender inmate provides Booking with a "preferred name," meaning a first name that they use in order to affirm their gender identity, staff shall not use their former name (also known as a "deadname") in communications with or about them. Staff may use their preferred name or last name, consistent with how they refer to other inmates. This paragraph will not prohibit the staff from using the inmate's former name where it appears in paperwork from the courts or other outside agencies. This section will not require the staff to modify records from a prior incarceration.

3. Questions relating to an inmate's gender identity or gender expression shall only be asked when necessary and related to a staff member's performing of official duties. (For example, in the context of intake, as described in Section E of this Policy.)

C. **IDENTIFYING TRANSGENDER AND GENDER NONCONFORMING INMATES**

1. A person's self-identification as transgender, gender nonbinary, gender nonconforming, or intersex, at any point before or during their time in custody, is sufficient to trigger the protections and procedures described in this policy. Documentation of a medical diagnosis or legal documentation concerning a person's self-identification is not required for staff to respect or confirm a person's gender identity, absent specific evidence that a person has asserted a gender identity falsely. The fact that a person has not obtained a legal name change or has not obtained government-issued identification that reflects their affirmed sex and gender identity does *not* constitute such specific evidence.

2. In the event that staff believe they have identified specific evidence that a person has asserted a gender identity falsely, before acting on such evidence, they should consider all sources of countervailing evidence that would support an inmate's asserted gender identity, including: records from the arresting agency or court staff confirming a person's gender identity as asserted; records from past custodial history confirming a person's gender identity as asserted; medical records confirming a person's treatment for gender dysphoria; and/or a gender expression/outward appearance that does not align with societal expectations about their assigned sex.

3. Any questioning performed by staff shall be conducted in a respectful manner and, to the greatest extent possible, be conducted in a private setting.

**D.  PHYSICAL SEARCHES AND HANDLING**

1.  All searches shall be conducted in accordance with BCSCF Policy III-2-D (Strip Searches) and BCSCF Policy II-3-C (Processing of Inmates).

2.  A transgender, gender nonbinary, gender nonconforming, or intersex person shall have the right to request that they be searched by staff of a particular sex based on their own view of what would be best for their safety and privacy. The person making the request will be searched consistently with their chosen sex designation, except in circumstances where the search must occur and no officers of the designated sex can perform the search.
    a.  If such a request is not honored, the reasons for its denial shall be documented and made available to the person who made the request.
    b.  Nothing above restricts supervisors or administrators from handling valid staff requests for accommodations regarding search-related duties, in the same manner as for searches of people who are not transgender.

**E.  INTAKE SCREENING AND PROCESSING**

1.  Screening assessments of all inmates, including LGBTI inmates, shall be respectfully conducted using BCSCF-approved screening instruments in accordance with BCSCF Policy II-6-C (Classification of Inmates).

2.  During the intake screening process, if a person being admitted has not made clear what their gender identity is, the staff member conducting the intake screening will respectfully ask the person if they would like to self-identify their gender identity. In so asking, the staff member will make clear that this information will be kept confidential from others, except for members of the staff on a need-to-know basis.

3.  Staff may seek advice from their supervisors and medical staff, as soon as practicable, during the intake process.

4.  Upon completion of initial screening, all LGBTI inmates who indicate that they take medication or have other medical or mental health needs must be referred to medical and mental health and provided an assessment and all appropriate care.

5.  Staff shall ask transgender, gender nonbinary, gender nonconforming, or intersex inmates if they have a name other than the one presented on the commitment document that they would prefer to be called. If so, the preferred name shall be documented in the corrections management software as an "alias" and understood as a "preferred name".-Because the "alias" designation could be misunderstood, staff shall be made aware that the name a person uses in order to be consistent with their gender identity is not false in any way and is the proper name by which to refer to that person.

**F.  HOUSING OF TRANSGENDER OR INTERSEX INMATES**

1. Housing determinations shall be individually tailored and based upon classification factors and an evaluation of the inmate's emotional and physical well-being.

2. Housing decisions must focus on minimizing the risk of sexual victimization.

3. At no time shall a transgender, gender nonbinary, gender nonconforming or intersex inmate be placed in a dormitory housing area.

4. A transgender, gender nonconforming, gender nonbinary, or intersex person taken into custody shall have the right to request placement in a sex-segregated unit (i.e., a men's or women's unit) that is based on their own view of what would be best for their safety, including placement that is consistent with that person's gender identity.

5. Where a request is made pursuant to paragraph (4) above, the person making the request will be housed in a unit consistent with the sex designation the person in custody indicated is safest for them, unless safety and security concerns prevent such placement. In assessing whether safety and security concerns prevent the requested placement:

   a. The requesting person's own view, with respect to his or her safety, is to be afforded serious consideration in a determination of housing.

   b. Reasonable protective measures should be considered and implemented to facilitate the requested placement.

   c. If the Sheriff, Jail Administrator, Supervisor, medical staff, or mental health staff, after an individualized determination, have safety, security, or health concerns related to a person's stated housing preference that cannot be reasonably addressed through reasonable protective measures, the Sheriff or designee may, on a case-by-case basis, deny that person's housing placement request.  Any such denial will be made as soon as practicable and:

      i. Be documented in the jail record management system, including the bases on which such denial was made and any alternative protective measures considered;

      ii. Be based on a specific and articulable safety, security, or health concern;

      iii. Not be based on any discriminatory reason, including but not limited to: (i) the anatomy or genitalia of the person whose housing

placement is at issue, (ii) the sexual orientation of the person whose housing placement is at issue, or (iii) a factor that does not bar other people in the requested housing unit.

    d.   In determining whether a safety, security, or health concern related to a person's stated housing preference pursuant to paragraph (4) above exists, the complaints of cisgender people who would be housed with such person may be considered only to the extent such complaints state reasonable and articulable safety or security concerns that cannot be addressed through reasonable protective measures, which, if required, shall be applied. A cisgender person's general desire not to be housed with someone because they are transgender, nonbinary, gender nonconforming, or intersex is not a reasonable and articulable safety or security concern.

    e.   Nothing above restricts staff from handling housing-related requests from people in custody that may involve moving someone within or between units of the same designated sex based on valid medical, religious, or safety concerns, in the same manner as for people who are not transgender.

6.  Any denial made pursuant to paragraph (5) above shall be made as soon as possible, and no later than 5 days after the request, and shall be available to the person whose housing request has been denied.  While housing decisions are final and not grievable, a person in custody may make a subsequent request based on changed circumstances or information not previously considered, and any such request shall be assessed at that time pursuant to the procedure outlined in paragraphs (3-5) above.

7.  Should a transgender, intersex, gender nonbinary, or gender nonconforming person report a concern for their safety, the housing unit officer shall immediately notify their supervisor, who will in turn notify the Jail Administrator via the chain of command. A representative of administration shall meet with the concerned inmate to formulate a mutually agreed upon safety plan. LGBTI inmates may not be placed on facility-directed protective custody or otherwise administratively segregated based solely upon their gender identity or sexual orientation or in violation of any state or federal law.

8.  If a transgender, gender nonconforming, gender nonbinary, or intersex person must be placed on facility-directed protective custody or otherwise administratively segregated, reviews shall be conducted pursuant to Section 7075.4 of the Minimum Standards and Regulations for Management of County Jails and Penitentiaries, N.Y. Comp. Codes R. & Regs. tit. 9, § 7075.4.

9.  In addition to requests made pursuant to paragraph (6) above—which will be considered as they are received—housing decisions shall be reviewed at least in accordance with minimum standards to consider changed circumstances such as allegations or substantiated incidents of sexual misconduct (by staff or other inmates), changes in appearance, upon request of the inmate or as the result of any other relevant information as may be received.

G. <u>**MEDICAL AND MENTAL HEALTH CARE**</u>

1. All LGBTI inmates shall be seen by medical staff for intake medical assessment to determine appropriate medical care.

2. Transgender, gender nonconforming, gender nonbinary, and intersex inmates shall also be assessed as part of the intake process for an appropriate treatment plan to include the need for continuation of community-initiated hormonal treatment and/or associated mental health services if indicated.

3. LGBTI inmates that report past sexual victimization to any staff members shall be offered appropriate medical and mental health services.

4. All transgender, gender nonconforming, gender nonbinary, and intersex inmates, even those that do not have a mental health diagnosis, shall be added to the Mental Health caseload as necessary and shall be seen at least monthly to assess well-being.

5. Any present or future medical care or mental health care provider shall be required to comply with this Policy and to confirm that the medical and/or mental health professionals it employs are able to provide appropriate care for transgender patients. Any future provider of health care in the BCSCF shall have internal policies in place for addressing treatment of patients with gender dysphoria so as to be consistent with the Policy before commencing service.

6. No person shall be denied medical or mental health care or have their access to such care restricted in any way because of their actual or perceived sex, gender identity, gender expression, or sexual orientation. For example, when a transgender person expresses a need for medical attention, staff shall handle the situation with the same urgency and respect they would offer to any other individual who sought assistance with a medical need.

7. Healthcare services, medical devices, and medications for the treatment of gender dysphoria, including prescription hormones and dilation devices for care after certain forms of gender-affirming surgery, shall be treated like any other healthcare services, medical devices, and/or medications necessary for a person in custody's health and well-being. Such services or treatments shall be provided as prescribed by medical staff.

8. Likewise, actual or perceived sex or gender identity shall not be used to justify the denial of otherwise appropriate medical care when such care is stereotypically associated with a particular assigned sex. For example, a transgender woman may need both gynecological care and treatment for a prostate condition, and her transgender status shall not be used to justify the denial of such medically necessary care.

H. <u>**COMPLAINTS AND GRIEVANCES**</u>

1. Any staff member notified of a complaint regarding sexual misconduct involving an LGBTI inmate shall treat it with high priority and immediately notify a supervisor.

2. Any sexual misconduct-related complaint or grievance involving an LGBTI inmate shall be handled in accordance with the grievance procedures set forth in the Inmate Handbook.

3. The shift supervisor should be immediately notified if a grievance is reported by a transgender, gender nonconforming, gender nonbinary, or intersex inmate.

I. <u>INMATE SERVICES (INCLUDING TOILETRY ITEMS, CLOTHING, AND PROGRAMMING)</u>

1. LGBTI inmates shall have equal access to all available services.

2. Toiletry items and clothing shall be available to people in custody in a manner that does not discriminate based on sex, gender identity, or gender expression. For example, a transgender woman shall have access to the same toiletry, clothing, and commissary items (e.g., women's undergarments, hair products, etc.) as a cisgender woman.

3. Grooming standards shall not be applied differently based on sex, gender identity, or gender expression. For example, if cisgender women are permitted to wear their hair at a certain length or in a certain style (e.g., in a ponytail), people who are not cisgender women shall be permitted to do the same.

4. Permission to access specific items, including prosthetics, wigs, hair extensions, chest binders, tucking undergarments or gaffs, or similar items that are used by individuals to have an appearance consistent with their gender identity, may be requested during the person's initial medical assessment performed during the booking process. A person shall be given the opportunity to request that certain items that would otherwise be prohibited—including wigs and hair extensions—be used as medically-prescribed treatment for gender dysphoria, and these requests will be evaluated in a way that is consistent with other requests for accommodations pursuant to medical need and safety and security concerns.

5. Programs, educational materials, and recreation activities shall not be denied due to actual or perceived sex or gender identity. For example, group activities, resources, or classes made available to cisgender people

in a particular housing unit shall also be available to transgender, gender nonconforming, gender nonbinary, or intersex people in that housing unit.

6. LGBTI people shall be permitted to shower at separate, reasonable, times from other people in the unit if they so desire in order to address safety concerns. However, a person who does not wish to do so shall not be forced to shower separately based solely on their actual or perceived sex, gender identity, or gender expression.

J. **STAFF TRAINING**

Staff shall receive initial academy and yearly refresher training on this Policy, in addition to training on sexual misconduct and protection of inmates, appropriate interaction with LGBTI inmates, and associated search procedures.

## Addendum 1

### Policy of the Broome County Sheriff's Office

### Regarding interactions with transgender, intersex, gender nonbinary, or gender nonconforming individuals:

### The following actions will not be tolerated by any persons entering the Broome County Sheriff's Correctional Facility, for any reason:

- DISCRIMINATION: You will not discriminate against, harass, or bully any person based on who they are, including their gender identity.
- NAMES/PRONOUNS: People should not use the wrong name or pronouns when talking to an inmate, even if the inmate hasn't gotten a legal name change or gender marker change on their ID.

Any complaint of any such action by a visitor will be promptly investigated and confirmed violations could result in the removal of visitation rights, or in a criminal investigation.

**Addendum 2**

**Plain Language Policy Statement regarding interactions with transgender, intersex, gender nonbinary, or gender nonconforming individuals:**

This policy means that:

- DISCRIMINATION: You should not be harassed or bullied based on who you are, including your gender identity.
- NAMES/PRONOUNS: People should not use the wrong name or pronouns when talking to you, even if you haven't gotten a legal name change or gender marker change on your ID.
- SEARCHES: You can request to be searched by a woman if you're a trans woman, or a man if you're a trans man, or by an officer of the gender you believe would be safest for you.
- HOUSING: You can request to be housed in the unit that is consistent with your gender identity.
- CLOTHES/APPEARANCE: You can dress consistent with your gender identity, and you can request commissary items and other things that affect the way you look and your gender expression.
- MEDICAL CARE: You can request medical and mental health care related to your gender identity, including hormones, no matter whether you had access to that same health care outside the jail.

If you think that you're being denied any of the things listed above, you can file a COMPLAINT with the housing unit officer, on duty supervisor, or the Jail Administrator.

## Addendum 3

The following Broome County Sheriff's Correctional Facility policies will be updated to cross-reference the relevant sections of the LGBTI Policy as follows:

- **Policy Statement # III-2-D – Strip Searches**
  - Cross-reference LGBTI Policy IV(D) (Physical Searches and Handling)
- **Policy Statement # II-6-C – Classification of Inmates**
  - Cross-reference LGBTI Policy IV(E) (Intake Screening and Processing) and IV(F) (Housing of Transgender or Intersex Inmates)
- **Policy Statement # II-3-C – Processing of Inmates**
  - Cross-reference LGBTI Policy IV(D) (Physical Searches and Handling), IV(E) (Intake Screening and Processing), and IV(F) (Housing of Transgender or Intersex Inmates)
- **Inmate Handbook**
  - ***Visitation Rules*** (p. 16-17)
    - Cross-reference LGBTI Policy IV(D) (Physical Searches and Handling)
  - ***Administrative Segregation/Protective Custody*** (p. 26)
    - Cross-reference LGBTI Policy IV(F) (Housing of Transgender or Intersex Inmates)

The following Broome County Sheriff's Correctional Facility policies will be updated to be gender neutral by removing the word "female" or "woman" consistent with the LGBTI Policy as follows:

- **Policy Statement # II-16-A – Personal Hygiene Supplies**
- **Policy Statement # II-21-A – Clothing and Bedding Issuance**
- **Inmate Handbook**
  - ***Personal Hygiene*** (p. 2)
  - ***Clothing*** (p. 3-4)
  - ***Medical Services*** (p. 10-11)
  - ***Restraints of Pregnant Inmates*** (p. 34-35)